WARREN R. LAMPE *et al.*, Beneficiaries u/t/a of Mabel R. Triner, Plaintiffs-Appellants, v. LINDA R. PAWLARCZYK, Defendant-Appellee.

First District (2nd Division)   Nos. 1—99—2251, 1—99—2276 cons.

Opinion filed May 30, 2000.

Randy J. Curato and Edward M. Graham, both of Bell, Boyd & Lloyd, of Chicago, for appellants.

Sandra K. Burns, of Law Offices of Sandra K. Burns, Ltd., of River Forest, for appellee.

JUSTICE GORDON delivered the opinion of the court:

In the first of these two consolidated appeals, Warren R. Lampe and W. Robert Lampe (the Lampes) appeal from orders of the Cook County circuit court denying their requests for attorney fees incurred in bringing an action against Linda Pawlarczyk (Linda) and in defending against her counterclaim. The Lampes are nephews of Mabel R. Triner (Mabel) and beneficiaries of the Mabel R. Triner trust (Trust) dated December 19, 1990. In the second appeal, Linda, also a beneficiary of the Trust and formerly trustee, appeals from a circuit court order denying her request for compensation for trustee's fees. For the reasons set forth below, we affirm in part and reverse in part the trial court's judgment in Linda's appeal, and remand the cause. We dismiss the Lampes' appeal for lack of jurisdiction.

## BACKGROUND

The Lampes filed a three-count complaint against Linda on September 2, 1997. In that complaint, they alleged that (1) on February 7, 1997, Linda withdrew from the Trust account and paid to herself $5,000; (2) on April 10, 1997, she caused certain Trust assets to be liquidated and withdrew and paid to herself $32,596; and (3) on April 15, 1997, she caused certain Trust assets to be liquidated and withdrew and paid to herself $2,930. The complaint also alleged that Linda made a claim against the Trust in her individual capacity for compensation for services rendered to Mabel during Mabel's life. The Lampes thus allege that Linda put herself in a conflict of interest with the Trust beneficiaries and breached her fiduciary duty as trustee. In count I of their complaint, the Lampes seek Linda's removal as trustee of the Trust; count II seeks an accounting from her of the Trust assets; and count III asks that a constructive trust be imposed over funds she withdrew from the Trust account. Attached to the complaint is a copy of the Trust agreement executed by Mabel on December 19, 1990, naming Warren Lampe (Warren) and Linda as trustees and designating Robert Lampe (Robert) as successor co-trustee if Warren were unable to serve in that role. The trustees were authorized to distribute for Mabel's benefit "as much of the net income and principal of the Trust, even to the extent of exhausting principal, as they may *** determine to be required for [Mabel's] welfare, comfort and support." Upon Mabel's death the Trust principal and any accrued income were to be distributed as follows: $10,000 to Linda, and the remainder in equal shares to Mabel's nephews, the Lampes, and to a third nephew, Harold Richak, who was Linda's father. According to the terms of the Trust, if Richak predeceased Mabel (which he did), his one-third share was to go to Linda.

On December 5, 1997, Linda filed a countercomplaint seeking $98,000 from the Trust as reimbursement for services Linda allegedly rendered to Mabel for 14 years until her death in 1996.[1] In her countercomplaint, Linda alleged that she and Warren were co-trustees of the Trust until July 13, 1993, when he resigned, and that Robert then was named successor co-trustee but that he resigned on November 15,

---

[1]Linda, acting individually, previously filed this claim on September 17, 1997, as a separate complaint against the Lampes and herself, acting as Trust beneficiary and trustee. The case was dismissed pursuant to section 2—619(a)(3) of the Code of Civil Procedure because there was "another action [the Lampes' complaint against Linda] pending between the same parties for the same cause." 735 ILCS 5/2—619(a)(3) (West 1994). On December 5, 1997, the trial court allowed Linda to refile the complaint as her countercomplaint in the Lampes' suit.

1993, leaving her as the sole trustee. She also alleged that on November 22, 1996, Mabel dictated (to Linda) and signed a "letter of direction" stating that Mabel wanted her entire estate to go to Linda. The counterclaim also states that in February 1997 Linda made a demand on the Trust in her individual capacity, claiming $98,000 as compensation for services rendered to Mabel. Attached to the counter-complaint is a copy of that demand, which is the same as the one Linda makes in the countercomplaint. In that demand, Linda states that she cared for Mabel from 1982 until her death in December 1996, providing a variety of services including taking Mabel grocery shopping, paying her utility bills, arranging for and providing transportation to and from doctor and dental appointments, and visiting with Mabel on a regular basis. Linda also oversaw Mabel's care after she fell and broke her hip in 1986, and upon Mabel's return home three months later Linda visited her daily for one year, and five times a week for the next five years, during which times she provided various services such as doing Mabel's laundry and cleaning her apartment. Linda also asserts that in September 1996, when plans were being made for Mabel to move to a nursing home, Linda inspected various facilities before deciding on the one best suited to meet Mabel's needs. Linda also visited Mabel every day during the time she was in the nursing home. Also included in the attachments to the counterclaim are copies of the Trust and of Mabel's pourover will, dated December 19, 1990, the date of the Trust agreement. The will names Robert and Warren as co-executors and names Linda as successor executor if both Warren and Robert are unable to serve. Under the terms of the will, any residue of Mabel's estate and any personal property not disposed of was to be added to the Trust at her death. Finally, the attachments to the counterclaim also included the previously mentioned "letter of direction" allegedly dictated and signed by Mabel stating that Mabel wanted to give $10,000 to each of the Lampes and the rest of her money to Linda.

The Lampes moved for summary judgment on their complaint on January 26, 1998, asking that Linda be removed as trustee, that she be ordered to provide an accounting of the Trust, and that a constructive trust be imposed over the funds Linda had withdrawn from the Trust. According to the Lampes, Linda should be removed as trustee because she put herself in the position of being both trustee of the Trust and an individual claimant against the Trust, thus creating a conflict of interest. They also allege that as beneficiaries they have a right to a full accounting of the Trust plus any other information needed to keep them fully informed. In addition, the Lampes allege that Linda breached her fiduciary duty and thus a constructive trust

should be imposed over assets she withdrew from the Trust. The Lampes also move for an award of attorney fees based upon their efforts as beneficiaries to save the Trust from destruction and restore it to its proper purposes. In support of their motion, the Lampes attach a copy of their original complaint and of Linda's answer.

In her response as trustee to the motion, Linda asserted that she had provided the Lampes with copies of the monthly statements of the Trust account. She also stated that as of May 1, 1997, she and the Lampes agreed that she would make no further withdrawals from the Trust without the agreement of the Lampes or a court order, except to pay outstanding Trust bills. She asserts that she made no withdrawals or payments after May 1, 1997, except to pay outstanding bills of the Trust. Included in the attachments to Linda's response is a copy of a letter dated May 1, 1997, from Randy Curato, attorney for the Lampes, to Sandra Burns, the attorney for the Trust, confirming the above-mentioned May 1, 1997, agreement. In an affidavit submitted along with her response, Linda states that her attorney notified the Lampes' counsel on March 24, 1997, that the Trust investments would be converted to cash and that distributions would then be made. According to the affidavit, shortly thereafter attorney Burns told Linda not to convert all the assets to cash because the Lampes' attorney had indicated that they might want to take their distribution in kind. Linda asserts that Burns subsequently made several inquiries of the Lampes as to how they wanted their distribution made but received no reply. Linda also asserts that at the time of Mabel's death the Trust principal totaled about $180,000 and that all payouts thereafter were for final bills for Mabel's care, taxes due on the Trust or other direct costs, and two payments to herself: $10,000 to pay her specific gift under the Trust, and $35,596 as partial payment of her one-third share under the Trust's residuary paragraph. According to Linda, following those payments, there was about $150,000 remaining in the Trust account.

The trial court granted the Lampes' summary judgment motion on April 21, 1998, ordering Linda removed as trustee and directing her to prepare and submit an accounting of the Trust. The court also established a constructive trust over the Trust assets that had been withdrawn by Linda. The court found that Linda had breached her fiduciary duty to the Lampes by using her position as trustee "to authorize payments to herself during the course of the trust relationship" and by submitting "a claim in her individual capacity against the Trust in the amount of $98,000.00 for services rendered." Also on April 21, the court took under advisement the Lampes' request for attorney fees.

In June 1998 Linda moved for a ruling on her countercomplaint granting her $98,000 claim, and the Lampes moved for summary judgment on Linda's counterclaim. In July the Lampes made a renewed motion for attorney fees, and in August Linda filed a "petition for compensation to trustee for services rendered to trust and to decedent." In that petition, Linda sought $10,000 per year for the 7.33 years from December 20, 1990 (the inception of the Trust), until April 21, 1998 (the date she was removed as trustee), as compensation for "Trustee's services rendered to the Trust and to MABEL R. TRINER and performing other related services allowed to be paid by the Trust." The amount requested was $73,300 "minus $35,596.00, the amount already paid to [herself] for Trustee's duties," yielding a net request of "$37,704.00 to be paid to [herself] from the Mabel R. [Triner] Trust prior to disbursements of amounts due beneficiaries under the terms of the Trust." The petition also included a listing of her purported services to the Trust, which she termed her "Trustee duties *** from December 20, 1990, until April 21, 1998," many of which were the same services to Mabel that were enumerated in Linda's $98,000 claim. Finally, Linda averred in her petition that Mabel promised her she would be reimbursed for her services when Mabel died, and that Warren had essentially agreed to that promise, telling Linda in December 1990 that she would be "taken care of."

On October 16, 1998, the trial court granted the Lampes' motion for summary judgment on Linda's counterclaim and denied with prejudice Linda's motion for grant of her $98,000 claim. The court also denied without prejudice Linda's separate ($73,300) petition for compensation to trustee. In denying that petition, the court stated that Linda had mixed together trustee services with nontrust, personal services such as "daily visits to the home, the *** tender loving care that she gave to the deceased," and that the court therefore was unable to determine "how much time [Linda] spent in preserving the assets of the trust." The court explained that the petition was being denied without prejudice until Linda "can spell out how much time [she] spent on the trust." Also on that same date (October 16, 1998), the trial court denied the Lampes' renewed motion for attorney fees.

One month later, Linda filed a five-count amended countercomplaint. Count I purports to seek compensation under the express terms of the Trust for services rendered to the Trust and to the decedent. Included in count I is a listing of services provided by Linda that is similar to the list in her previous, $73,300 petition for compensation to trustee. However, in the amended countercomplaint Linda then breaks those services into three categories. The first category is described by Linda as "services and duties performed [b]y LINDA dur-

ing the time she acted as Trustee [that] have been acknowledged by WARREN and ROBERT *** to be duties relating to the Trust *** for which LINDA should be reimbursed." Included in that group are the following:

> "a. All banking activities, cashing of pension checks, depositing checks, monthly reconciliation of checking account and monthly review of financial statements;
>
> b. Management of household expenses and writing checks for payment of household expenses including food, medication, utilities and all other monthly expenses of MABEL;
>
> c. Paying quarterly deposits for state and federal taxes;
>
> d. Cashing checks for payment of dry cleaning[ ] [and] laundry expenses;
>
> e. Upon the death of MABEL, coordinating all funeral arrangements including[ ] purchasing burial clothing, ordering funeral flowers, purchasing the headstone and coordinat[ing] all arrangements with the cemetery."[2]

The second category is described as "services and duties performed by LINDA relat[ing] to the Trustee's power to 'distribute to MABEL or apply for MABEL's benefit as much of the net income and principal of the Trust as the Trustee may from time-to-time [*sic*] determine to be required for MABEL's welfare, comfort and support.' " Included in that group are services such as coordinating all doctor and dental appointments, processing Mabel's mail, and "[t]raveling with MABEL and alone" to stores. The third category is described as services performed during Mabel's life "to provide for MABEL's 'maintenance, comfort, companionship, enjoyment and medical care' as provided in the Trust. That language refers to article III(A)(5)(m) of the Trust agreement, which authorizes the trustees "[t]o employ during [Mabel's] life any person or persons to attend to [her] maintenance, comfort, companionship, enjoyment and medical care." Included in that third group are services such as writing letters for Mabel, reading to her, and visiting her daily.

Counts II through V of the amended countercomplaint are designated as complaints for breach of contract, promissory estoppel, unjust enrichment/contract implied in law, and promissory fraud. In the countercomplaint, Linda seeks $72,960 as compensation for "services and care to MABEL by LINDA as Trustee" from the inception of

---

[2]We note that in their response to Linda's earlier petition for compensation to trustee, the Lampes acknowledged that most of these services were "compensable under the Trust[s] and Trustees act or the trust instrument."

the Trust until April 1998, when Linda was removed as trustee.[3] She also seeks an additional $115,950 as compensation for care and services rendered to Mabel from 1981 to the inception of the Trust in December 1990. Included among the attachments to the amended countercomplaint is an affidavit showing the hours per month and total hours spent in performing various duties and services. Those services are broken into two categories: services performed by Linda for Mabel from 1982 to the inception of the Trust in December 1990, and those performed for Mabel from that date until her death in 1996.

On December 1, 1998, the Lampes filed a motion asking the court to reconsider its denial of the request for attorney fees. On the same date, Warren filed with the court a petition for trustee's fee seeking $7,737.50 as compensation for services rendered when he was co-trustee.

The trial court struck Linda's amended countercomplaint on April 7, 1999, and granted her leave to file an amended petition for trustee's fees to comply with the Trusts and Trustees Act (760 ILCS 5/1 *et seq.* (West 1994)). Linda filed her "amended petition for compensation to trustee for services rendered to trust" on April 29, 1999. In that petition, she shortened her list of services and duties that Warren and Robert acknowledged as compensable under the Trust. This abbreviated list included only items a, c and e from the previous list in count I of the amended countercomplaint, which were as follows:

> "a. All banking activities, cashing of pension checks, depositing checks, monthly reconciliation of checking account and monthly review of financial statements;
> ***
> c. Paying quarterly deposits for state and federal taxes;
> ***
> e. Upon the death of MABEL, coordinating all funeral arrangements including[ ] purchasing burial clothing, ordering funeral flowers, purchasing the headstone and coordinat[ing] all arrangements with the cemetery."[4]

Also included in Linda's amended petition is a list of services and

---

[3]In the countercomplaint, Linda refers to this period as "from the inception of the Trust until April, 1996," but "1996" clearly is a typographical error.

[4]As was the case with the listing in count I of the amended countercomplaint, here too the Lampes acknowledged (in their motion to dismiss Linda's amended countercomplaint) that those items "are compensable under the Act since they relate directly to the trustee's duties." In the motion to dismiss the amended countercomplaint, the specific items to which the Lampes referred were a, c and z of paragraph 5 of the affidavit attached to Linda's amended

duties that is nearly identical to the second category of services provided in count I of her amended countercomplaint, but with some items added. The list in the amended petition has a similar description as well: "services and duties *** performed by LINDA as Trustee, which duties include duties relative to the Trustee's duties and powers as stated in the Trust to 'distribute to MABEL or apply for MABEL's benefit as much of the net income and principal of the Trust as the Trustee may from time-to-time [sic] determine to be required for MABEL's welfare, comfort and support.' " The amended petition omits a separate category of services to provide for Mabel's "maintenance, comfort, companionship, enjoyment and medical care."

Linda alleges in her amended petition that she, Warren and Robert met shortly after Mabel's death in December 1996 to discuss the amount of compensation to be paid to Linda for her services to Mabel and the Trust. The negotiations broke down, but Linda alleges that it was her understanding from the meeting that she had Warren's approval "to advance to herself a payment for less than the amount she would receive as her share of the Trust" and that "payment to all three beneficiaries would be 're-worked' when the parties reached an agreement on the amount to be paid to LINDA for services provided to MABEL and the Trust." In her amended petition, Linda seeks compensation for 4,150.8 hours spent on Trust duties and services to Mabel, for a total amount ranging from $62,262 to $211,815.32, depending upon the hourly rate used. Linda's statement in the *ad damnum* clause that she seeks compensation for those hours "as Trustee" underscores her insistence that she should be compensated for personal services to Mabel as trustee services. Included in the attachments to the amended petition is an affidavit that is nearly identical to the second portion of the affidavit included in the amended countercomplaint. The listing of services and hours spent on them is described in the same way: trust duties and services for Mabel performed by Linda from the inception of the Trust on December 19, 1990, to Mabel's death in 1996.

On May 19, 1999, the court denied Linda's amended petition for compensation to trustee. The court stated that the claim was "most unartfully [sic] presented" and that there was "no basis to award compensation to the trustee for services rendered." Also on May 19,

---

countercomplaint. Items a, c and z of paragraph 5 of that affidavit are identical to items a, c and e in count I of the amended countercomplaint and to the three items included in the abbreviated list included in the amended petition for compensation to trustee.

464

the court denied the Lampes' motion to reconsider the award of attorney fees. The instant appeals followed, both of which were filed on June 17, 1999.

## DISCUSSION

The standard of review in both of these appeals is abuse of discretion. The question of attorney fees rests within the sound discretion of the trial court (*Rennacker v. Rennacker*, 156 Ill. App. 3d 712, 715-16, 509 N.E.2d 798, 801 (1987); *Brown v. Brown*, 62 Ill. App. 3d 328, 337, 379 N.E.2d 634, 641 (1978)), as does the amount of compensation to be awarded to a trustee (*Smith v. Stover*, 15 Ill. App. 2d 78, 93, 145 N.E.2d 515, 523 (1957); *Rogers v. Belt*, 317 Ill. App. 81, 83, 45 N.E.2d 511, 512 (1942)).

### A. Linda's appeal

Linda appeals from the trial court's order on May 19, 1999, denying her request for compensation for trustee's fees. She argues on appeal that the trial court had authority to award compensation for all of the services she requested under both the Trusts and Trustees Act (760 ILCS 5/1 *et seq.* (West 1994)) (the Act) and the specific terms of the Trust agreement, as well as under a theory of *quantum meruit*. She also argues that there was an implied contract between her and Mabel to pay her the reasonable value of the Trust services she performed for Mabel and the Trust.

The Lampes argue that neither the Act nor the Trust agreement authorizes compensation for trustees for non-Trust, personal services. They argue that Linda's petition was correctly denied because she persisted in claiming compensation for non-Trust, personal services as well as Trust services, and she failed to identify the Trust services with specificity, both in contravention of the trial court's order. They also argue that Linda failed to provide sufficient factual support for her claims.[5]

Linda argues first that the trial court had authority to award all the fees she requested, including compensation for personal services to Mabel, under sections 3 and 7 of the Act and under the terms of the Trust agreement. We disagree.

■ Section 7 of the Act provides that a "trustee shall be reimbursed

---

[5]The Lampes also contend that Linda waived any right to a trustee's fee because in the nearly eight years that she served as trustee she never submitted an accounting of her services, never billed the Trust estate, and never took a fee. The Lampes cite no case authority (or any other authority) to support that position, and we are aware of no authority that does. We therefore disregard it.

for all proper expenses incurred in the management and protection of the trust and shall be entitled to reasonable compensation for services rendered." 760 ILCS 5/7 (West 1994). Although Linda appears to argue that the language referring to "reasonable compensation for services rendered" applies to the personal services she performed for Mabel, that is clearly not the case. By its terms, section 7 authorizes compensation only for services performed "in the management and protection of the trust," not for personal services. See *In re Butler's Trusts*, 223 Minn. 196, 206, 26 N.W.2d 204, 211 (Minn. 1947) (usual and normal services performed by trustee in return for compensation are "[a]ll services involved in the exercise of his discretionary powers or duties in managing the trust and, in addition, certain ministerial duties" such as "keeping accurate and complete bookkeeping records and *** preparing periodic administration accounts"), cited with approval in *Smith v. Stover*, 15 Ill. App. 2d 78, 90-92, 145 N.E.2d 515, 522 (1957); see generally G. Bogert & G. Bogert, Trusts & Trustees § 980, at 189 (rev. 2d ed. 1983) (compensation of trustee is paid for administration of the trust). While services such as the monthly reviewing of financial statements or the paying of quarterly deposits for state and federal taxes might be deemed administration of the trust, other, more personal services that Linda rendered to Mabel such as taking her grocery shopping or visiting with her on a regular basis clearly are not. Section 7 does not authorize compensation to Linda as trustee for non-Trust services.

■ Linda also points to section 3(1) of the Act, which provides:

"A person establishing a trust may specify in the instrument the rights, powers, duties, limitations and immunities applicable to the trustee, beneficiary and others and those provisions where not otherwise contrary to law shall control, notwithstanding this Act. The provisions of this Act apply to the trust to the extent that they are not inconsistent with the provisions of the instrument." 760 ILCS 5/3(1) (West 1998).

Thus, under the foregoing language Linda contends that specific provisions in a trust agreement are valid under the Act so long as they are not contrary to law. According to Linda, there are three provisions in the instant Trust agreement that, taken together, authorize compensation to the trustee not only for regular Trust services but for the personal services she rendered to Mabel as well. We disagree here as well.

■ Article I(C) states, approximating the language of section 7 of the Act, that the trustees "shall be entitled to receive reasonable compensation for their services under this Trust" and that they "shall

be reimbursed for reasonable expenses." Hence, article I(C) authorizes compensation to the trustee for services provided under the Trust. Article I(A) states that the trustees "shall distribute to [Mabel] or apply for [her] benefit as much of the net income and principal of the Trust, even to the extent of exhausting principal, as they may from time-to-time [*sic*] determine to be required for [Mabel's] welfare, comfort and support." Further, article III(A)(5)(m) authorizes the trustee "[t]o employ during [Mabel's] life any person or persons to attend to [Mabel's] maintenance, comfort, companionship, enjoyment and medical care." Although the Trust agreement authorizes the trustee to apply Trust assets for Mabel's welfare and comfort, and even authorizes the trustee to employ someone to attend to such needs, that does not mean the agreement authorizes compensation to Linda as trustee for personal services to Mabel. As already noted, such personal services are not by definition trust services. Further, if Linda in effect hired herself under article III(A)(5)(m) to provide these services, then they cannot be trustee services since they were performed by Linda not as trustee but as individual employee who was *hired by* the trustee. As previously noted, what Linda seeks in this appeal is compensation for trustee's fees. In her notice of appeal, she states that she appeals from the trial court's order "on May 19, 1999, denying [her] Complaint for Compensation for Trustee's Fees." That "Complaint" is titled by Linda "Verified Amended Petition for Compensation to Trustee for Services Rendered to Trust." Further, in the prayer for relief, she asks that she "be compensated for 4,150.80 hours of service as Trustee and that LINDA be paid for Trustee's services rendered to the Trust." Finally, the trial court's order of May 19, 1999, states that "[Linda] Pawlarczyk's Petition for Compensation to Trustee is DENIED." Linda includes the personal services she rendered to Mabel as part of the trust services for which she seeks trustee fees, but as already noted, they cannot be such services. Therefore, we find that the trial court did not abuse its discretion in denying Linda's claim for trustee fees for personal services to Mabel.

Nevertheless, Linda contends that the personal services she performed under article III(A)(5)(m) are Trust related because, if she had not performed them, someone else would have been employed for that purpose. She argues that the payments to that third party or parties would have exhausted the Trust estate years before Mabel's death, leaving no Trust property to be distributed to any beneficiary. We find that contention unavailing. As already noted, the personal services Linda performed for Mabel under article III(A)(5)(m) are not trust services and Linda thus cannot be compensated for them as trust services. See *Butler's Trusts*, 223 Minn. at 206, 26 N.W.2d at 211, cited

with approval in *Smith v. Stover*, 15 Ill. App. 2d at 90-92, 145 N.E.2d at 522; see generally G. Bogert & G. Bogert, Trusts & Trustees § 980, at 189 (rev. 2d ed. 1983).

The situation is different with respect to the Trust-related services for which Linda seeks compensation. The Lampes argue that Linda's claim cannot succeed because she persisted in claiming compensation not only for Trust-related duties but for non-Trust, personal services, and she failed to identify the Trust services with specificity, thus ignoring the trial court's instructions. We disagree. It is true that when the trial court denied without prejudice Linda's initial petition for trustee fees, it noted that Linda's claims for Trust-related services were "mixed in" with non-Trust, personal services and that it was thus impossible to determine how much time Linda had spent "preserving the assets of the trust." The logical inference from that instruction is that, in any amended petition, Linda was at least to separate out Trust-related from non-Trust services. In her amended petition, we believe that she substantially complied with that directive. Before listing services performed for Mabel's welfare, comfort and support, she presented the following list of Trust-related services:

> "a. All banking activities, cashing of pension checks, depositing checks, monthly reconciliation of checking account and monthly review of financial statements;
> \*\*\*
> c. Paying quarterly deposits for state and federal taxes;
> \* \* \*
> z. Upon the death of MABEL, coordinating all funeral arrangements including[ ] purchasing burial clothing, ordering funeral flowers, purchasing the headstone and coordinat[ing] all arrangements with the cemetery."

Those items correspond to items 5(a), (c) and (z) in the affidavit attached to Linda's amended countercomplaint, items that the Lampes acknowledge (in their motion to dismiss the countercomplaint) "are compensable under the Act since they relate directly to the trustee's duties." It appears to us that Linda did follow the trial court's instructions, at least as to separating out Trust-related from personal services and specifically identifying the Trust-related services. Under both the Act and the Trust agreement, Linda clearly is entitled to compensation for services directly related to her duties as trustee.

However, the Lampes argue that Linda nevertheless failed to provide sufficient factual support for her claims, again in contravention of the trial court's instruction. They assert that she failed to provide specific dates on which various services were performed and

the time spent performing the service on each date. We find that argument unavailing. In the affidavit attached to her amended petition, Linda did list (where appropriate) the number of hours spent per month in performing each service, and in each case the total number of hours spent. "The intent of the law is that the trustee, in some manner, make a showing of the performance of his acts with sufficient detailed proof in connection therewith, so that the court can determine what is a fair and proper amount of compensation to be granted." *Rogers v. Belt*, 317 Ill. App. 81, 84, 45 N.E.2d 511, 512 (1942). It may be that what Linda provided is not "sufficient detailed proof" and that the dates and times noted by the Lampes would be helpful in determining an appropriate amount of compensation. Even so, we do not think the appropriate course in this case is to deny Linda's petition entirely. As already noted, she followed the trial court's instruction as to separating out the Trust-related services, even to the point of limiting that list to items that the Lampes conceded were Trust-related. If all she needs to do now is provide more factual support for the claims, that can be accomplished by giving her leave to amend. We are aware that she was given leave to amend before and still came back with a claim for non-Trust, personal services as well as legitimate Trust duties. Nevertheless, we think the fact that Linda separated out the Trust-related services shows that she made a good-faith attempt to follow the trial court's instructions. *Cf. Templeton v. Continental Illinois National Bank & Trust Co.*, 429 F. Supp. 1294, 1301 (N.D. Ill. 1977) ("[I]t must appear that [the trustee] acted in bad faith as a trustee" in order to justify depriving her of "fees *** legitimately earned in the performance of [her] duties"). Further, we are not convinced that the trial court did instruct Linda to provide dates and times spent. In any case, we think Linda should be given an opportunity to provide whatever additional support is needed as to her Trust-related services. We therefore reverse the trial court's denial of Linda's petition with respect to clearly Trust-related services and remand the cause for the purpose of giving her leave to amend her petition one more time.

Because of our disposition of this issue, we need not consider Linda's arguments as to implied contract and *quantum meruit*. We have already held that she is entitled to compensation for services clearly related to trustee duties. She seeks further compensation for personal services as trustee services, and we have already indicated that the personal services rendered to Mabel cannot be characterized as trust services. Further, none of the three cases upon which she relies for her implied contract and *quantum meruit* arguments involved a trustee or trustee fees.

## B. The Lampes' Appeal

█ The Lampes appeal from those portions of the trial court's orders of October 16, 1998, and May 19, 1999, denying their motion for attorney fees and their motion for reconsideration of that denial. On appeal, the Lampes argue that under Illinois law they are entitled to an award of attorney fees and that the trial court thus abused its discretion in denying their fee request. According to the Lampes, it was their efforts that protected the Trust from destruction and preserved its assets, while Linda's actions were aimed at dissipating Trust funds for her personal benefit, to the detriment of the other beneficiaries. The Lampes claim that Linda is at fault for necessitating the litigation against her and that whatever attorney fees are awarded therefore should come from her share of the Trust assets and not from the Trust assets generally. The Lampes also argue that it was an abuse of discretion for the trial court to deny their fee request without explaining the reasons for the denial.

Linda argues that because the Lampes filed no postjudgment motion or notice of appeal within 30 days after the October 16, 1998, denial of their attorney fee request, their appeal in this case was untimely and we have no jurisdiction to hear it. Linda also argues that the Lampes neither protected the Trust nor restored it to its proper purpose. She contends that the Trust was not in danger of being destroyed and its purpose was being fulfilled; hence, she argues that the Lampes are not entitled to attorney fees.

We consider first Linda's contention that we lack jurisdiction to hear the Lampes' appeal. The trial court denied the Lampes' renewed motion for attorney fees on October 16, 1998. According to Linda, that decision was appealable under Supreme Court Rule 304(b)(1) (155 Ill. 2d R. 304(b)(1)). However, because the Lampes' notice of appeal was not filed until June 17, 1999, more than 30 days after the October 16 decision, she contends it was untimely. We find that argument persuasive. Under Supreme Court Rule 303(a)(1) (155 Ill. 2d R. 303(a)(1)), a notice of appeal must be filed within 30 days "after the entry of the final judgment appealed from." If a "timely post-trial motion *** is filed," then the time for filing the notice of appeal is extended to "within 30 days after the entry of the order disposing of the last pending post-judgment motion." 155 Ill. 2d R. 303(a)(1). The Lampes' motion to reconsider was a postjudgment motion, but it was not filed until December 1, 1998, more than 30 days after the October 16 judgment. Hence it was untimely under section 2—1203 of the Code of Civil Procedure (735 ILCS 5/2—1203 (West 1992)) and it did not toll the time for filing the notice of appeal. *Cf. Benet Realty Corp. v. Lisle Savings & Loan Ass'n*, 175 Ill. App. 3d 227, 230, 529 N.E.2d

718, 720 (1988) (timely filed postjudgment motion tolls time for filing notice of appeal under Supreme Court Rule 303(a)(1)). Thus the Lampes' June 17, 1999, appeal of the October 16 denial of their fee request was untimely, and we lack jurisdiction to hear it. See 155 Ill. 2d R. 301.

The Lampes argue that their appeal was timely filed because it came within 30 days after May 19, 1999, when the trial court denied their motion to reconsider and hence resolved the last pending postjudgment motion in the case. Implicit in that argument is the contention that their motion to reconsider was itself not untimely and thus tolled the period for filing a notice of appeal. That contention is based upon the Lampes' claim that the October 16, 1998, denial of their fee request was not final and appealable under Supreme Court Rule 304(b)(1). Section 2—1203 applies only to motions following final judgments, and if the October 16 ruling was not final, then there was no 30-day limit within which to file the motion to reconsider. See *Archer Daniels Midland Co. v. Barth*, 103 Ill. 2d 536, 538-39, 470 N.E.2d 290, 291-92 (1984) (judgment that is not final cannot be attacked by motion to reconsider). We disagree with the Lampes' contentions.

Under Supreme Court Rule 304(a), if a final judgment disposes of fewer than all of the claims in an action (as is the case here), it is appealable only if the trial court makes an express written finding that there is no just reason for delaying enforcement or appeal. 155 Ill. 2d R. 304(a); *Marsh v. Evangelical Covenant Church*, 138 Ill. 2d 458, 464, 563 N.E.2d 459, 463 (1990). Without such a finding, the trial court's order is not appealable until all of the claims have been resolved. 155 Ill. 2d R. 304(a); *Marsh*, 138 Ill. 2d at 464, 563 N.E.2d at 463. No such Rule 304(a) finding was made here. However, the October 16 ruling is still appealable under Supreme Court Rule 304(b)(1), which provides:

"The following judgments and orders are appealable without the finding required for appeals under paragraph (a) of this rule:

(1) A judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party." 155 Ill. 2d R. 304(b)(1).

The trial court's October 16 decision was an order entered in the administration of an estate, and it finally determined the Lampes' rights as to their request for attorney fees. Hence, Rule 304(b)(1) applies, and the Lampes' appeal was untimely.

The Lampes contend that Rule 304(b)(1) does not apply to privately administered trusts and therefore is inapplicable here. They rely upon *In re Estate of Nicholson*, 268 Ill. App. 3d 689, 644 N.E.2d 47 (1994), and *Yardley v. Yardley*, 137 Ill. App. 3d 747, 484 N.E.2d 873

(1985), but their reliance is misplaced. In *Nicholson*, the plaintiff, who was the son and sole heir of the decedent, sued The Northern Trust Company (Northern), which served as executor under the decedent's will and as successor trustee under his declaration of trust. The plaintiff pled eight counts alleging that the will and trust were invalid. Northern's motion to dismiss was granted as to all counts, but the plaintiff was given leave to replead one of the counts pertaining to the will. The plaintiff appealed the dismissal of the other seven counts. The appellate court held that the appeal was premature, rejecting the plaintiff's argument that there was jurisdiction under Supreme Court Rule 304(b)(1). Focusing first on the trust counts, the court held:

> "[T]his rule does not apply to the counts involving the trust because this trust is not a 'similar proceeding' involving comprehensive court administration of an estate. The trust is being administered privately, out of court, without any court involvement such as court-approved administrators or a requirement of a final accounting to the court." *Nicholson*, 268 Ill. App. 3d at 693, 664 N.E.2d at 50.

The Lampes argue that here, just as in *Nicholson*, their claims arise from a privately administered trust and that Rule 304(b)(1) does not apply. However, even though the trust in the instant case may have been privately administered, there was court involvement of the very type referred to by the *Nicholson* court: Linda was ordered by the trial court to submit an accounting of the Trust.

The situation is the same with *Yardley*, where the plaintiff filed a six-count complaint against The Northern Trust Company (Northern) and two other defendants, individually and as trustees. The trial court dismissed five of the six counts (count I survived), in which the plaintiff sought various remedies against the defendants in connection with their administration of certain trusts. Subsequently the trial court denied the plaintiff's motion to vacate the dismissal, refusing to make a Rule 304(a) finding that there was no just reason to delay enforcement or appeal. The plaintiff appealed the order of dismissal (of the five counts) within 30 days of that denial but before judgment was entered on count I. Northern moved to dismiss the appeal as premature. Later, after judgment was entered in the plaintiff's favor on count I, she filed a second appeal of the dismissal order. The appellate court accepted jurisdiction over the second appeal but found that the first was premature, rejecting the plaintiff's argument that the appeal was timely filed under Rule 304(b)(1). The court explained:

> "The trusts involved in this case were not being administered in comprehensive court proceedings like estate or guardianship proceedings. They were being administered privately, out of court,

by defendant trustees. Moreover, the trustees were not court-approved administrators required to settle various claims, and *to make a final accounting to the court.*" (Emphasis added.) *Yardley*, 137 Ill. App. 3d at 751, 484 N.E.2d at 876.

Once again, we note that in the instant case, unlike *Yardley*, Linda *was* ordered to submit an accounting of the Trust. We therefore find that the Trust in the instant case was not privately administered within the meaning of *Nicholson* and *Yardley* but was instead public to an extent sufficient for Rule 304(b)(1) to apply.

The Lampes also argue that Rule 304(b)(1) does not apply because their fee request was collateral or incidental to the principal action in the case. According to the Lampes, because the fee request itself (and its subsequent denial) were only indirectly related to the complaint against Linda, there is no danger that delaying the appeal of such an incidental ruling (until all the claims are resolved) would mean the entire case had to be reopened. See *People ex rel. A.M. v. Herlinda M.*, 221 Ill. App. 3d 957, 964, 583 N.E.2d 36, 40 (1991). There is thus no reason for the immediate appealability provided under Rule 304(b)(1). We find that argument unpersuasive.

The court in *In re Estate of Kime*, 95 Ill. App. 3d 262, 419 N.E.2d 1246 (1981), upon which Linda relies, found that Rule 304(b)(1) did apply to a fee request very similar to the Lampes'. We find that case instructive. The petitioner in *Kime* brought suit against her family members, alleging that certain grain and livestock possessed by those respondent family members were in fact owned by her deceased father at the time of his death and not by a partnership between her father and the respondents. The trial court found that the property was owned by the father and not by the partnership and directed the executors to inventory it as part of the father's estate. Subsequently the petitioner sought attorney fees and costs from the estate, based upon the alleged benefit to the estate resulting from her attorney's efforts in the earlier proceeding. The trial court denied the petition for fees and costs on November 28, 1979. More than six months later, on June 26, 1980, the petitioner appealed that denial as well as five other orders relating to the estate. The petitioner conceded that her appeal of the two earliest orders might be time-barred under Rule 304(b)(1), but she argued that three of the other orders, including the denial of the fee request, did not fall under that rule because they did not finally determine the right or status of a party. The appellate court rejected that argument with respect to the fee denial and one other order. Referring to the fee denial, the court held that it was a final determination that the petitioner and her attorney were not entitled to attorney fees and costs based upon their efforts in the earlier, property

proceeding. "As such, under Rule 304(b)(1), if an appeal was desired from that order, it was incumbent upon petitioner *** to file a notice of appeal within 30 days of November 28, 1979." *Kime*, 95 Ill. App. 3d at 268, 419 N.E.2d at 1250. The court held that because no such timely appeal was filed, the court had no jurisdiction to hear the appeal.

In reaching that conclusion, the court in *Kime* discussed the rationale for allowing certain orders in an estate proceeding to be appealed under Rule 304(b)(1) without a Rule 304(a) finding. The court stated:

> "A central reason behind making the time for appeal of such orders mandatory, and not optional, is that certainty as to some issues is a necessity during the lengthy procedure of estate administration. Little imagination is needed to conjure up the intolerable consequences of permitting a party, at his option, to wait until an estate administration is concluded before appealing an order, entered perhaps several years previously, which denied a motion to remove an executor or allowed a claim against the estate. In such circumstances, were an appellant successful, then the entire administration might have to be begun again. Thus, in the interests of efficiency and the sound and practical administration of estates, orders in estate proceedings must be appealed within 30 days from entry when they finally determine the right or status of a party, even though they are preliminary to a final settlement of estate proceedings." *Kime*, 95 Ill. App. 3d at 268, 419 N.E.2d at 1250.

The Lampes argue for a distinction in the application of Rule 304(b)(1), contending in essence that a fee request in an estate proceeding that is collateral to the main action should not fall within the scope of the rule even if its denial does finally determine a party's right to attorney fees. We disagree.

Our reading of the rationale presented in *Kime* is that no such distinction is to be made. Under Rule 304(b)(1), "[a] judgment or order entered in the administration of an estate, guardianship, or similar proceeding which finally determines a right or status of a party" is appealable without a Rule 304(a) finding. 155 Ill. 2d R. 304(b)(1). The rule itself makes no such distinction for collateral rulings, and neither does *Kime*. We therefore find that Rule 304(b)(1) does apply to the Lampes' fee request and its denial. Just as in *Kime*, the trial court's October 16 decision here was a final determination that the Lampes had no right to attorney fees. Thus their motion to reconsider, coming more than 30 days later, was untimely under section 2—1203. It did not toll the time for filing a notice of appeal, and the Lampes' subsequently filed notice of appeal (June 17, 1999) was therefore untimely as well. We do not have jurisdiction to hear the Lampes' appeal of the October 16 denial of their fee request.

Even if we were to accept the collateralness distinction argued by

the Lampes, there still would be no jurisdiction. A close reading of *Herlinda*, upon which the Lampes rely, shows that their fee request is not collateral within the meaning of that case. In *Herlinda*, the public guardian of Cook County sought attorney fees for its representation of minors as a guardian *ad litem* in a child abuse proceeding. The request was pursuant to section 2—17(5) of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 802—17(5)), which provided:

> "The reasonable fees of a guardian ad litem appointed under this Section shall be fixed by the court and charged to the parents of the minor, to the extent they are able to pay. If the parents are unable to pay those fees, they shall be paid from the general fund of the county." Ill. Rev. Stat. 1987, ch. 37, par. 802—17(5).

The trial court denied the request, holding that section 2—17(5) applied only to private attorneys and not to the public guardian. On appeal, the public guardian argued initially that the denial of its fee request was appealable under Supreme Court Rule 304(b)(1), but the appellate court disagreed. The court noted that fee requests generally are "collateral or incidental to the principal action," adding that it did not believe "the denial of the fee request in this case is the type of decision contemplated by Rule 304(b)(1) as interpreted by *Kime*." *Herlinda*, 221 Ill. App. 3d at 964, 583 N.E.2d at 40. The court explained:

> "There is no danger that the trial court's denial of fees will cause the entire proceeding to be relitigated. After all, the very reason fee requests are deemed to be collateral is that the issues involved in adjudicating such requests largely lie outside the issues involved in the principal action." *Herlinda*, 221 Ill. App. 3d at 964, 583 N.E.2d at 40.

The fee request in *Herlinda* is indeed unlike the request in *Kime*. In *Herlinda*, the request is pursuant to a statute that focuses essentially on the award of fees. It states simply that the reasonable fees of a guardian *ad litem* "appointed under this Section" are to be fixed by the court and charged to the parents of the minor. In *Kime*, however, the request was based upon the alleged benefit to the petitioner's father's estate arising from her attorney's efforts in a proceeding that resulted in property being added to the estate. The issues involved in adjudicating the fee request in *Kime*, unlike *Herlinda*, did not "lie outside the issues involved in the principal action." *Herlinda*, 221 Ill. App. 3d at 964, 583 N.E.2d at 40. Indeed, they invoked essentially the same issues as in the principal action. Further, the situation in the instant case is almost exactly on point with *Kime* but unlike that in *Herlinda*. The Lampes' fee request is not pursuant to a statute such as the one in *Herlinda*. Instead, the Lampes seek attorney fees based upon the alleged benefit to the Trust that resulted

from their efforts. According to the Lampes, they "saved the trust from destruction and preserved the trust assets." Hence, the issues involved in adjudicating their fee request are the same as the central issues in their action against Linda. Accordingly, contrary to the Lampes' contention, their fee request is not collateral or incidental to the principal action here, and it falls under the scope of Rule 304(b)(1).

We also find that we have no jurisdiction to consider the Lampes' appeal of the May 19, 1999, denial of their motion to reconsider. Because that motion was untimely, the trial court had no jurisdiction to hear it, and therefore the trial court's denial of the motion to reconsider is itself void for lack of jurisdiction. See *Beck v. Stepp*, 144 Ill. 2d 232, 238, 579 N.E.2d 824, 827 (1991) ("trial court loses jurisdiction to vacate or modify its judgment 30 days after entry of judgment [citations] unless a timely post-judgment motion is filed"); *In re Application of the County Treasurer & Ex-Officio County Collector of Cook County for Judgment & Order of Sale Against Real Estate Returned Delinquent for the Nonpayment of General Taxes for 1984*, 208 Ill. App. 3d 561, 563-64, 567 N.E.2d 486, 488 (1990) (trial court's denial of motion to reconsider is void for lack of jurisdiction where motion itself was untimely filed). Therefore, we lack jurisdiction to hear the Lampes' appeal of the May 19, 1999, denial of their motion to reconsider. *Cf. Phoenix Bond*, 208 Ill. App. 3d at 563, 564, 567 N.E.2d at 488-89 (where trial court's initial order included Rule 304(a) finding and where motion to reconsider was untimely filed, appellate court had no jurisdiction to hear appeal of trial court's denial of that motion even though appeal was filed within 30 days of the denial).

For the reasons set forth above, we affirm the trial court's denial of Linda's petition for trustee fees insofar as it applies to personal services to Mabel, but reverse as to the denial of fees for Trust-related services and remand for further consideration of the latter issue. We dismiss the Lampes' appeal for lack of jurisdiction. We note further that, even if there were jurisdiction, it would be unnecessary to consider the merits of the Lampes' request for fees. As previously noted, the issues involved in adjudicating that request are the same as the central issues in the Lampes' complaint against Linda. Because we reversed in part the trial court's decision in favor of the Lampes on Linda's complaint, the issues as to the Lampes' fee request would in any event have to be reconsidered even if the trial court's determination with respect to them would also have favored the Lampes.

The appeal of Linda Pawlarczyk (No. 1—99—2276) is affirmed in part and reversed in part; cause remanded.

The appeal of Warren R. Lampe *et al.* (No. 1—99—2251) is dismissed.

No. 1—99—2276, Affirmed in part and reversed in part; cause remanded.

No. 1—99—2251, Dismissed.

McNULTY and McBRIDE, JJ., concur.